# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>LEILIH SMART,<br><br>    Defendant. | 3:19-CR-30023-RAL<br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS STATEMENTS** |

A nurse called and reported to tribal law enforcement that a small child was at the hospital with burns on his hands and may have been the victim of child abuse. A patrol officer went to the hospital and spoke briefly with the child's mother, Leilih Smart. A detective then questioned her after securing a *Miranda* waiver. Smart moved to suppress her statements to both officers under *Miranda*[1] and the Fifth Amendment. Because the officers obtained Smart's statements lawfully, the Court recommends that her suppression motion be denied.

## BACKGROUND

Some time after midnight on January 1, 2019, Smart took her 22-month-old son to the Indian Health Services (IHS) emergency room (ER) in Eagle Butte, South Dakota.

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

About 2:00 a.m., an ER nurse contacted the Cheyenne River Sioux Tribe Law Enforcement Services (CRSTLES) to report suspected child abuse, but gave no names. CRSTLES Officer Aaron Runs After (a patrol sergeant) responded to the ER. There, he met with the nurse who informed him that the child had submersion burn marks on his hands. She identified the child, K.S., and his mother, Smart, and directed Runs After to the room they were in. He opened the large sliding glass door to the room further and entered, leaving the door open approximately two to three feet. Inside, Smart sat on a bed, holding K.S. Her 9-year-old daughter, L.T., was present as well. Runs After was acquainted with Smart. She was a former police officer for the CRSTLES and a co-worker of Runs After. As part of her training, Smart attended the State Division of Criminal Investigation Academy in Pierre.

Runs After spoke with Smart, in front of the children, and recorded what went on in the room using the body camera he had on his lapel.[2] Before turning on the camera, Runs After introduced himself and asked Smart what happened. She related K.S. had peed all over the bathroom and was touching himself. While cleaning him up, Smart explained, she had him wash his hands with soap in the sink and did not realize the water was so hot and he burned his hands. Runs After asked her a few follow-up questions and Smart and L.T. both provided additional details. After about eight

_____

[2]*See* Mot. Hrg. Ex. 1 (Nov. 20, 2020); *see also* Mot. Hrg. Ex. 2 (transcript of recording).

minutes, Runs After advised Smart that he had to notify Social Services "to make sure that everything's covered," and told her to "hold on, okay."  He then left the room and requested dispatch to get ahold of Social Services and the on-call detective right away.

Dispatch contacted CRSTLES Detective Larry LeBeau at 2:35 a.m.  He promptly called and talked to Runs After for a minute or less, drove to the hospital, and arrived 20 minutes later.  LeBeau spoke to Smart's mother, Brenda Eagle Chasing, in the hospital lobby.  From there, LeBeau went to the ER area, where he talked briefly again with Runs After and then with medical staff, before meeting with Smart.

Smart agreed to talk to LeBeau in an adjacent room and to answer questions about what transpired with K.S.  Before doing so, LeBeau orally Mirandized Smart.  She said she understood her rights and was willing to speak to LeBeau.  Because he did not have an advice of rights form with him, LeBeau made notations on a sheet of paper of when and how he administered the *Miranda* warnings and requested Smart to sign under his jottings.  She did this, as LeBeau watched, and he too signed the paper.[3]

Smart provided LeBeau with a statement about the events that led to her bringing K.S. to the ER.  Smart never invoked any of her rights during the interview.  At the end of it, LeBeau arrested Smart on tribal charges.

The next month, a federal grand jury indicted Smart and charged her with assault resulting in serious bodily injury to a child and child abuse.  Smart later moved

---

[3]*See* Mot. Hrg. Ex. 3.

to suppress her statements to Runs After and LeBeau on *Miranda* and Fifth Amendment grounds.  At an evidentiary hearing held on the motion, the Court heard testimony from Runs After and LeBeau and received three exhibits into evidence.

## DISCUSSION

### A.  Pre-*Miranda* Statements and  Custody

Smart claims that the statements she made at the IHS Hospital to Officer Runs After should be suppressed because she was never advised of her *Miranda* rights.[4] *Miranda* requires that law enforcement officers provide certain warnings before they conduct an interrogation of a suspect who is in custody.[5]  Smart contends that she was in custody when Runs After questioned her about K.S. and that she should have been Mirandized before he did.[6]

Officers need not administer *Miranda* warnings to everyone they question.[7] Instead, "warnings are required only where there has been such a restriction on a person's freedom to render h[er] 'in custody.'"[8]

---

[4]*See* Dkt. No. 54 at 2-3.

[5]*See Miranda*, 384 U.S. at 478-79.

[6]*See* Dkt. No. 54 at 3.

[7]*See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

[8]*Id*.

"Custody" is a "term of art" that describes circumstances generally thought "to present a serious danger of coercion."[9]  The central issue in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[10]  "Two discrete inquiries are essential to this determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt [s]he [ ] was not at liberty to terminate the interrogation and leave."[11]  "[T]he critical [question] is not whether the interview took place in a coercive or police dominated environment, but rather, whether the [suspect's] 'freedom to depart was restricted in any way.'"[12]  When gauging the suspect's freedom of movement, a court must examine "all of the circumstances surrounding the interrogation."[13]  "Relevant factors" include, but are limited to, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the

---

[9]*Howes v. Fields*, 565 U.S. 499, 508-09 (2012).

[10]*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (internal quotation omitted).

[11]*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (*quoting Thompson* and emphasizing that the custody determination has "two discrete inquiries").

[12]*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*) (*quoting Mathiason*, 429 U.S. at 495).

[13]*Howes*, 565 U.S. at 509 (*quoting Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (*per curiam*)).

release of [the suspect] at the end of the questioning."[14]  The Eighth Circuit has set forth several common "indicia" which tend to either mitigate or aggravate an atmosphere of custodial interrogation.[15]  These indicia, while instructive, are not dispositive or exhaustive.[16]  They are merely one way to determine whether the suspect's movement was curtailed, as though she was under formal arrest, and subjected to the same inherently coercive pressures as the station house questioning at issue in *Miranda*.[17]

Although restricted somewhat by the circumstances (K.S.'s medical exigencies) and the surrounding she was in (the ER), Smart was not in custody for purposes of *Miranda* as evidenced by the following:

1.    The interview took place in the ER of a hospital, a neutral setting.[18]

---

[14]*Howes*, 565 U.S. at 509 (citations omitted).

[15]*See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

[16]*See id.*; *see also United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011); *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005); *United States v. Czichary*, 378 F.3d 822, 827 (8th Cir. 2004).

[17]*See Howes*, 565 U.S. at 509.

[18]*See United States v. Berres*, 777 F.3d 1083, 1092 (10th Cir. 2015); *United States v. Infante*, 701 F.3d 386, 397 (1st Cir. 2012); *United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007); *United States v. Bruguier*, 161 F.3d 1145, 1152 (8th Cir. 1998); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985); *United States v. Casellas*, 149 F.Supp.3d 222, 240 (D.N.H. 2016); *see also United States v. Bright*, 1:18-cr-99 DRL-SLC, 2020 WL 5076825 at *1 (N.D. Ind. Aug. 20, 2020) (questioning took place at hospital and lasted only 45 minutes); *United States v. Overington*, Criminal Action 07-147, 2007 WL 3119843 at *4 (E.D. Pa. Oct. 24, 2007) ("The interview took place in a hospital rather than the coercive atmosphere of a police station); *People v. Sampson*, 2017 CO 100, ¶¶ 26, 30, 404 P.3d 273, 278-79 (officer's hospital interview did not occur in seclusion); *State v. Warrior*, 294 Kan.
(continued. . .)

6

2.    Smart went to the hospital of her own accord to get treatment for K.S.[19]

3.    Officer Runs After came in contact with Smart at the hospital after an ER nurse suspected child abuse.[20]

4.    Smart agreed to talk to and answer Runs After's questions and did so.[21]

5.    The interview lasted just over 10 minutes and Smart did almost all the talking.[22]

---

484, 497-98, 277 P.3d 1111, 1123 (2012) (the interviews occurred in the defendant's hospital room, a "neutral location"); *Owens v. State*, 399 Md. 388, 430 & n.49, 924 A.2d 1072, 1096 (2007) (hospital room "a public place akin to a sidewalk or park for purposes of Fifth Amendment analysis"); *State v. Estepp*, No. 16279, 1997 WL 736501 at *5 (Ohio Ct. App. Nov. 26, 1997) (interview was in a place an individual would normally feel free to leave – a hospital, not the police station); *see generally* Kimberly J. Winbush, *What Constitutes "Custodial Interrogation" At Hospital By Police Officer Within Rule of Miranda v. Arizona Requiring That Suspect Be Informed Of His Federal Constitutional Rights Before Custodial Interrogation – Suspect Hospital Visitor, Not Patient*, 31 A.L.R.6th 465 §§31, 32 (2008) (type of room in hospital where interview took place – public and private areas).

[19]*See Infante*, 701 F.3d at 397; *Martin*, 781 F.2d at 673; *see also Warrior*, 294 Kan. at 502, 277 P.3d at 1125 (the defendant "was taken to the hospital for treatment, not by order of law enforcement"); *State v. Anderson*, CO-97-718, 1998 WL 74261 at *2 (Minn. Ct. App. Feb. 24, 1998) (no custody where father, suspected of killing his 15-month-old infant son, voluntarily drove himself to the hospital and was not restrained during, or charged immediately after, the interview); *State v. Portigue*, 125 N.H. 338, 339, 345-46, 480 A.2d 896, 897, 901 (1984) (mother, who repeatedly struck her daughter for months, not in custody where she drove herself to the hospital and met with police there).

[20]*See Morales v. State*, 749 N.E.2d 1260, 1264-65 (Ind. Ct. App. 2001) (mother took her two-year-old daughter to hospital for medical treatment of diaper rash; ER nurse, suspecting a burn injury, contacted police; mother held not to be in custody when questioned about the injury at the hospital); *Estepp*, 1997 WL 736501 at **1, 6 (police called to hospital to investigate possible abuse of two-month-old child; mother's live-in boyfriend interviewed there; no custody found, despite the existence of a few factors that pointed in his favor).

[21]*See Griffin*, 922 F.2d at 1349, 1351; *Overington*, 2007 WL 3119843 at *5.

[22]*See Stechauner v. Smith*, 852 F.3d 708, 716 (7th Cir. 2017); *Infante*, 701 F.3d at 398; *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011); *United States v. Jamison*, 509 F.3d

(continued. . .)

6.    Runs After asked a modest number of non-confrontational questions, seeking clarification of matters Smart volunteered, and obtained biographical information from her.[23]

---

623, 633 (4th Cir. 2007); *Griffin*, 922 F.2d at 1348-49; *Bright*, 2020 WL 5076825 at *1; *Overington*, 2007 WL 3119843 at *5; *Tail*, 2005 WL 2114227 at *2; *see also Warrior*, 294 Kan. at 498, 277 P.3d at 1123 (the interviews were short in duration and dealt with the defendant's accounting of events); *State v. Jackson*, 304 Conn. 383, 418, 40 A.3d 290, 313 (2012) (the questioning of the suspect at the hospital was "neither prolonged nor aggressive"); *Commonwealth v. Mejia*, 461 Mass. 384, 390, 961 N.E.2d 72, 79 (2012) (the hospital questioning was "brief and not aggressive"); *Owens*, 399 Md. at 429, 924 A.2d at 1096 (the questioning was brief, lasting only 10 to 15 minutes); *State v. Riffle*, 131 Ariz. 65, 67, 638 P.2d 732, 734 (Ariz. Ct. App. 1981) (mother, believed to have had a role in causing her three-month-old daughter's death, was not in custody where she was interviewed in a hospital room for a "surprisingly short duration" and none of the usual indicia of arrest were present – no handcuffs, locked doors, drawn guns or search of the mother's person or belongings conducted); *see also* 31 A.L.R.6th 465, §25 (length of police questioning – interview brief).

    [23]*See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *Berres*, 777 F.3d at 1092; *Infante*, 701 F.3d at 397; *see also Gren v. Greiner*, 89 Fed. Appx. 754, 757 (2d Cir. 2004) (hospitalized defendant was not in custody where a single officer asked a limited number of questions, conducted an investigatory (rather than accusatory line of questioning, and was not handcuffed); *People v. Theander*, 2013 CO 15, ¶33, 295 P.3d 960, 969 (officers asked the suspect open-ended questions and maintained a pleasant and non-confrontational tone throughout the interview); *Mejia*, 461 Mass. at 390-91, 961 N.E.2d at 79 (the questioning was limited to what "happened"); *Pickett v. State*, 922 So.2d 987, 992 (Fla. Dist. Ct. App. 2005) (the defendant, whose daughter was being treated for suspected child abuse injuries, was not in custody where the questions, in a hospital emergency waiting room, were for background and informational purposes); *State v. Rotko*, 116 Wash. App. 230, 241, 67 P.3d 1098, 1103 (2003) (the defendant, who was ultimately arrested for criminal mistreatment of his infant, was not in custody because he was interviewed in an investigatory, non-accusatory manner in a quiet room at the hospital and was not handcuffed or physically restrained, even though police did ask him to wait to be questioned); *Riffle*, 131 Ariz. at 67, 638 P.2d at 734 (mother questioned in connection with the death of her infant daughter not in custody where interview was "neutral and non-accusatory in nature"); *State v. Sumler*, 395 So.2d 766, 768 (La. 1981) (mother not in custody where officer, at the hospital, asked how the burns to her 18-month-old son occurred; officer was simply gathering general information about the circumstances of the case and did not arrest her after she made statements to

(continued. . .)

8

7.     Smart was forthcoming about what happened, providing detailed information to Runs After, and refused to carry on a conversation with her mother on the phone (telling her mother she would call her back because she was talking to a "cop").[24]

8.     Runs After never employed strong-arm tactics or deceptive stratagems to goad Smart into making inculpatory admissions.[25]

9.     The atmosphere of the interview was not police-dominated (Runs After was the only officer in the room with Smart and her two children).[26]

10.     Smart was never handcuffed or restrained in any way and could leave, or ask Runs After to, if she desired.[27]

---

him); *see generally* 31 A.L.R.6th 465 §§ 22, 24 (substance and tone of police questioning).

[24]*See Casellas*, 149 F.Supp.3d at 241; *see generally* 31 A.L.R. 6th 465 §23 (level of defendant's cooperation).

[25]*See Stechanuer*, 852 F.3d at 716; *Berres*, 777 F.3d at 1092; *New*, 491 F.3d at 374; *United States v. Mattox*, 18-cr-263 (DWF/ECW), 2019 WL 2343697 at *6 (D. Minn. April 3, 2019), *R&R adopted*, 2019 WL 2341578 (D. Minn. June 3, 2019); *Iron Hawk*, 2008 WL 3914519 at *3; *Tail*, 2005 WL 2114227 at *2.

[26]*See Berres*, 777 F.3d at 1092; *Infante*, 701 F.3d at 397; *New*, 491 F.3d at 374; *Griffin*, 922 F.2d at 1351-52; *Mattox*, 2019 WL 2343697 at *6; *Iron Hawk*, 2008 WL 3914519 at *3; *Tail*, 2005 WL 2114227 at *2; *see also Warrior*, 294 Kan. at 497, 277 P.3d at 1123 (the defendant was interviewed in a non-police-dominated atmosphere – his hospital room – with family present and not in custody); *State v. Steimel*, 155 N.H. 141, 145-46, 921 A.2d 378, 382-83 (2007) (no custody where only one officer interviewed the defendant, the entire conversation lasted only 20-30 minutes, and the defendant was never physically restrained); *Estepp*, 1997 WL 736501 at *6 (detective was not major participant in the interview, was assigned to a different police unit, and social worker – a neutral party – was present and asked questions); *see generally* 31 A.L.R.6th 465 §20 (number of officers – only one officer present).

[27]*Infante*, 701 F.3d at 398; *New*, 491 F.3d 373-74; *Bruguier*, 161 F.3d at 1152; *Casellas*, 149 F.Supp.3d at 241; *Mattox*, 2019 WL 2343697 at *6; *Iron Hawk*, 2008 WL 3914519 at *3; *Overington*, 2007 WL 119843 at *5; *Tail*, 2005 WL 2114227 at *2; *see also Warrior*, 294 Kan. at 501, 277 P.3d at 1124 (shooting victim was neither actually restrained by law enforcement nor under the functional equivalent of custody); *Theander*, 2013 CO 15, ¶33, 295 P.3d at 968-69 (officers did not handcuff the suspect at any point, they left her

(continued. . .)

9

11.     Smart, a former police officer, was 31 years old at the time, in college, and did not exhibit any unusual intellectual deficit, mental impairment, or vulnerability.[28]

12.     Runs After left the room at the conclusion of the interview and did not place Smart under arrest.[29]

Now it is true that Runs After did not advise Smart of her *Griffin* rights.[30]  His failure to do so, however, did not make the interview a custodial one.[31]  Nor did

---

hospital door open, and did not block it); *see generally* 31 A.L.R.6th 465, §11 (ability of defendant to leave hospital).

[28]*See Perrin*, 659 F.3d at 721; *see also Bright*, 2020 WL 5076825 at *1 (the defendant appeared lucid); *Jackson*, 304 Conn. at 419, 40 A.3d at 313 (no evidence that the suspect's age or intelligence rendered him especially vulnerable to police intimidation and he was alert and coherent when speaking to police).

[29]*See New*, 491 F.3d at 373; *Bruguier*, 161 F.3d at 1152; *Mattox*, 2019 WL 2343697 at *6; *Iron Hawk*, 2008 WL 3914519 at *3; *Tail*, 2005 WL 2114227 at *2; *see also Warrior*, 294 Kan. at 503, 277 P.3d at 1125 (officers did not arrest the defendant after any of her hospital interviews); *Owens*, 399 Md. at 429, 924 A.2d at 1096 (the defendant was not placed under arrest after brief questioning at the hospital).

[30]*See Griffin*, 922 F.2d at 1349-50.

[31]*See United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007) (recognizing that, while the suspect had not been informed he was free to leave, the totality of the circumstances established that his cooperation was voluntary and that he was not in custody); *United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002) (finding that the suspect was not in custody for *Miranda* purposes even though agents failed to inform him that he was not under arrest, that the questioning was voluntary, that he could refuse the interview request, or that he was free to leave, where the totality of the circumstances indicated he was not in custody); *United States v. Mottl*, 946 F.2d 1366, 1370-71 (8th Cir. 1991) (although agents neglected to inform the defendant he could terminate the interview at will and did not let him know at the outset of their intention not to arrest him, he was not in custody, where his freedom of movement was not restrained, he voluntarily agreed to participate, and no deceptive stratagems were employed); *Iron Hawk*, 2008 WL 3914519 at *3 (deciding that officer's failure to inform the suspect at the outset that the questioning was voluntary did not create a custodial

(continued. . .)

Detective LeBeau's subsequent arrest of Smart transform her earlier meeting with Runs After into a custodial encounter under *Miranda*. Some time passed between the meeting and that arrest. During the intervening period, LeBeau gave Smart *Miranda* warnings and conducted his own interview of her.[32] Granted, Runs After was armed when he met with Smart. But the coat he had on partially covered his service revolver. And there is no suggestion that he drew or brandished the gun at any point or that a weapon was used to threaten or intimidate Smart.[33] Although Runs After stood between Smart

---

situation within the meaning of *Miranda*); *Griner v. State*, 168 Md. App. 714, 733, 899 A.2d 189, 200 (2006) (grandmother of 4-year-old victim, not in custody, where police did not tell her she was free to leave but she drove to the hospital on her own, was free to stop police questioning and leave at any time, and was not restrained or arrested at the end of the interview).

[32]*See United States v. Lowen*, Crim. 10-96 (RHK/RLE), 2010 WL 2653224 at *17 (D. Minn. June 1, 2010), *R&R adopted*, 2010 WL 2653217 (D. Minn. June 25, 2010), *aff'd* 647 F.3d 863 (8th Cir. 2011); *Iron Hawk*, 2008 WL 3914519 at *3.

[33]*See Berres*, 777 F.3d at 1092 (none of the officers in the hospital room had their weapons displayed); *Infante,* 701 F.3d at 397-98 (officers' weapons remained holstered at all times); *United States v. Galceran*, 301 F.3d 927, 930 (8th Cir. 2002) ("[A]lthough the officers had weapons, they 'did not adopt a threatening posture toward [the suspect], display their weapons or make a physical show of force during the questioning period.'"); *Bright*, 2020 WL 5076825 at *1 (officers at the hospital were armed but never showed their weapons during the questioning); *Overington*, 2007 WL 3119843 at *5 (officer did not draw or display his concealed firearm during hospital interview); *Tail*, 2005 WL 2114227 at *2 (no custody where agent was wearing a weapon during the hospital interview but the weapon was covered from sight by a vest); *Owens*, 399 Md. at 429, 924 A.2d at 1096 (detectives were wearing their side arms but did not draw or display them in any threatening manner); *see generally* 31 A.L.R.6th 465 §§ 33, 34 (police attire and weaponry).

and the partially open door to the room, the remaining circumstances neutralized any resulting illations of custody.[34]

Taking into account and weighing the totality of the circumstances, a reasonable person in Smart's shoes would not have understood she was in custody while briefly conversing with Officer Runs After in the ER.  He thus did not have to warn Smart of her *Miranda* rights before interviewing her.  Because the precepts of *Miranda* were adhered to, Smart's attempt to suppress her statements on custody grounds must fail.

### B.  Post-*Miranda* Statements and "Two-Step" Interrogation

Citing *Missouri v. Seibert*,[35] Smart also claims that her interview with Detective LeBeau must be suppressed because it was the product of her initial unlawful interrogation.[36]  This claim fails for two reasons.  First, the Court has already determined that Smart's interview with Officer Runs After was not custodial and taken in violation of *Miranda*.[37]  Second, even if it were, her later, Mirandized statements, are still admissible as substantive evidence.

---

[34]*See Infante*, 701 F.3d at 397; *Estepp*, 1997 WL 766501 at **5-6.

[35]542 U.S. 600 (2004).

[36]*See* Dkt. No. 54 at 3-5.

[37]*See United States v. Thunderhawk*, 799 F.3d 1203, 1207 (8th Cir. 2015) (because the defendant was not in custody – so *Miranda* warnings were not required – *Seibert* has no bearing").

12

### 1. Applicable Law

When a defendant makes incriminating statements without first being warned of her *Miranda* rights, courts in the Eighth Circuit use the test from Justice Kennedy's concurrence in *Seibert*[38] to determine whether statements she made in a later, properly warned, interrogation should be suppressed.[39]   In *Seibert*, police arrested a suspect, intentionally refrained from giving her *Miranda* warnings, and interrogated her in the middle of the night.[40]   The suspect confessed, after which she received a short break before being interrogated again – this time with *Miranda* warnings at the start – and gave the same confession.[41]   While questioning the suspect the second time, the interrogating officer confronted her with unwarned statements she had given previously.[42]

This same officer admitted that he made a "conscious decision" to withhold the suspect's *Miranda* warnings.[43]   The officer testified that he used a technique where he would "question first, and then give the [*Miranda*] warnings, and then repeat the

---

[38]*See* 542 U.S. at 619-22.

[39]*See e.g., United States v. Torres-Lona*, 491 F.3d 750, 757-58 (8th Cir. 2007); *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006); *United States v. Briones*, 390 F.3d 610, 613-14 (8th Cir. 2004).

[40]*See Seibert*, 542 U.S. at 604-05.

[41]*See id*. at 605.

[42]*See id*.

[43]*Id*. at 605-06.

question 'until I get the answer that she's already provided once.'"[44]  The state trial court only suppressed the suspect's unwarned statements and the case eventually wound up before the Supreme Court.

Although there was no majority opinion, Justice Kennedy's concurrence provided the final vote for suppression of the later-warned statements.[45]  The plurality adopted a multi-factor test to determine whether mid-questioning warnings were effective.[46]  Justice Kennedy though believed the case should be resolved on narrower grounds, suppressing post-warning statements "only where the police intentionally used the two-step interrogation technique to render *Miranda* warnings ineffective."[47]

The Eighth Circuit has determined that when there is no evidence of "deliberately coercive or improper tactics" (such as a two-step interrogation technique), and when the two questioning sessions are separated by time and location, *Oregon v. Elstad*[48] controls.[49]  The Supreme Court in *Elstad* held: "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement

---

[44]*Id*. at 606.

[45]*See id*. at 618.

[46]*See id*.at 615.

[47]*Ollie*, 442 F.3d at 1142.

[48]470 U.S. 298 (1985).

[49]*United States v. Walker*, 518 F.3d 983, 985 (8th Cir. 2008).

ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."[50]

### 2. Smart's Interview

Even if Officer Runs After's interview was custodial and offended *Miranda*, there is still no evidence that the interview was part of an intentional interrogation technique designed to undermine the efficacy of *Miranda* or thwart its purpose. First, Smart has provided no evidence of improper coercion on the part of Runs After. She cooperated with him and made statements voluntarily and with little prompting. His actions were not the sort of a deliberate scheme that *Seibert* sought to prevent.

Second, the two interviews involved different officers and settings and were separated by time. Detective LeBeau, not Officer Runs After, questioned Smart alone (with no children present) in another hospital room with the door closed. The time elapsed between the two conversations was not long – about 45 minutes. But the break, coupled with the new interrogator and change in rooms, supports a finding that no improper two-step interrogation occurred.[51]

Finally, unlike the officer in *Seibert*, who purposefully confronted the suspect with her pre-warned statements, no showing has been made that Detective LeBeau

---

[50]470 U.S. at 314.

[51]*See Walker*, 518 F.3d at 985; *United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir. 2005); *United States v. Garreau*, 735 F.Supp.2d 1155, 1169 (D.S.D. 2010), *aff'd*, 658 F.3d 854 (8th Cir. 2011).

used Smart's statements to Officer Runs After as leverage or as a coercive force to elicit more damning ones.  The lack of any evidence to this effect also supports a finding that no improper interrogation scheme was afoot.[52]

The concerns of *Seibert* are not implicated here because there is no "designed, deliberate, or calculated" circumvention of *Miranda*.[53]  The reasoning of *Elstad*, therefore, applies and, absent proof of coercion (and there is none), the second statement (to Detective LeBeau) need not be suppressed.[54]  Smart makes no claim that her post-*Miranda* statements were not knowingly, voluntarily, and intelligently made, and the Court does not see any basis in the record to find they were.  This being the case, Smart's statements to LeBeau are admissible at trial in the prosecution's case-in-chief.

## CONCLUSION

Officer Runs After did not cross the legal line when he interviewed Smart without a *Miranda* advisement.  Smart was not in custody when she spoke to Runs

---

[52]*See Torres-Lona*, 491 F.3d at 758 (finding no deliberate failure to warn where, in part, there was no evidence that officers confronted the defendant with his prior statement in order to have it repeated); *United States v. Terry*, 400 F.3d 575, 582 (8th Cir. 2005) (no evidence that agent used multi-stage interrogation in a calculated way to undermine *Miranda* warning); *see and compare Seibert*, 542 U.S. at 605-06 (where officer used a two-stage interrogation technique to get the suspect to repeat her prior, unwarned, statements).

[53]*United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009).

[54]*See Walker*, 518 F.3d at 985.

After, with her children by her side, in the ER.  Runs After thus did not have to inform Smart of her privilege against self-incrimination and right to the assistance and presence of counsel.

Yet even if Smart's statements to Runs After stemmed from custodial interrogation, *stemmed from* does not compel the suppression of the warned statements, she made later on, to Detective LeBeau.  The reason is simple:  officers did not engage in a staged attempt to sidestep, or do an end around, *Miranda*.

### RECOMMENDATION

Accordingly, based on the authorities and legal analysis set forth in this report, and the record now before the Court, it is hereby

RECOMMENDED that Smart's Motion to Suppress Statements[55] be denied in its entirety.

### NOTICE

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[56] Unless an extension of time for cause is later obtained,[57] failure to file timely objections will result in the waiver of the

---

[55]*See* Dkt. No. 53.

[56]*See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[57]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

right to appeal questions of fact.[58]  Objections must "identify[] those issues on which

further review is desired[.]"[59]

Dated this 7th day of December, 2020, at Pierre, South Dakota.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[58]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[59]*Arn*, 474 U.S. at 155.